# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

CROWN CASTLE FIBER LLC,    )
)
              Plaintiff, )
)
      v.            )    C.A. No. N21C-08-126 PRW
)
CITY OF WILMINGTON and )
DELAWARE DEPARTMENT OF )
TRANSPORTATION,      )
         Defendants. )

Submitted: July 26, 2022
Decided: October 3, 2022

## MEMORANDUM OPINION AND ORDER

*Upon Crown Castle Fiber LLC's Motion for Summary Judgment,*
**DENIED.**

Geoffrey G. Griver, Esquire, BUCHANAN INGERSOLL & ROONEY, PC, Wilmington, Delaware; Shawn N. Gallagher, Esquire, BUCHANAN INGERSOLL & ROONEY, PC, Philadelphia, Pennsylvania. *Attorneys for Plaintiff Crown Castle Fiber LLC*.

Gary W. Lipkin, Esquire, ECKERT SEAMANS CHERIN & MELLOTT, LLC, Wilmington, Delaware; Charles A. Zdebski, Esquire, ECKERT SEAMANS CHERIN & MELLOTT, LLC, Washington, DC. *Attorneys for Defendant City of Wilmington*.

Bradley S. Eaby, Esquire, Deputy Attorney General, STATE OF DELAWARE DEPARTMENT OF JUSTICE, Dover, Delaware. *Attorney for Defendant Delaware Department of Transportation*.

**WALLACE, J.**

Crown Castle Fiber, LLC has long sought to install 5G-related wireless network infrastructure in the City of Wilmington. In its way, says Crown Castle, is the City's untoward obstinacy, requiring, among other things, that the parties enter into a license agreement as a precondition to moving forward with the project. The parties' dispute is fueled by their competing views of state laws, city ordinances and regulations, and that local rubric's interplay with the Federal Telecommunications Act.

For the reasons set forth below, Crown Castle's Motion for Summary Judgment is **DENIED**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A. THE PARTIES

Crown Castle Fiber, LLC ("Crown Castle") is a Delaware Public Service Commission-certified public utility that provides infrastructure to wireless carriers in Delaware.[1] Its operations include the installation of distributed antenna systems, *e.g.*, small antennas and related equipment, a/k/a "nodes," on utility poles in the public rights-of-way.[2] Crown Castle provides its infrastructure to wireless carriers

---

[1]    Second Am. Compl. ¶ 13, *Crown Castle Fiber LLC v. City of Wilm.*, N21C-08-126 PRW (Del. Super. Ct. Feb. 18, 2022) (D.I. 32).

[2]    Tr. of Oral Arg. on Pl.'s Mot. for Summ. J. at 4 (hereinafter "Del. Ch. Arg. Tr."), *Crown Castle Fiber LLC v. City of Wilm.*, C.A. No. 2019-0656-MTZ (Del. Ch. July 7, 2021) (D.I. 32).

to broaden the 5G network to the wireless carriers' subscribers.[3]

The City of Wilmington (the "City") is a Delaware municipality.[4] The City regulates municipal activity, including the handling and processing of permit applications for construction-type projects in its rights-of-way.[5]

The Delaware Department of Transportation ("DelDOT") is an agency organized under the laws of Delaware responsible for regulating and maintaining statewide transportation systems.[6] Delaware's Advanced Wireless Infrastructure Investment Act tasks DelDOT with "the absolute care, management and control of the state rights-of-way" with respect to statewide 5G deployment.[7]

## B. THE FEDERAL TELECOMMUNICATIONS ACT OF 1996

Congress enacted the Federal Telecommunications Act ("FTA") "to provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services by opening all telecommunications markets

---

[3]  *Id.* at 5, 29.

[4]  Second Am. Compl. ¶ 14.

[5]  *See* Pl.'s Am. Opening Br. in Supp. of Mot. for Summ. J. at 1, 34, Oct. 29, 2021 (D.I. 19).

[6]  Second Am. Compl. ¶ 15; *see also* DelDOT's Answer to Second Am. Compl. ¶ 15, Mar. 11, 2022 (D.I. 33). Though originally omitted from the initial pleadings, DelDOT has since been joined as a necessary party to this action because it issued authorization permits central to this litigation. *See* Judicial Action Form, Jan. 28, 2022 (D.I. 29).

[7]  DEL. CODE ANN. tit. 17, § 1602 (2019) (findings of public policy).

to competition."[8]  The FTA created a dual system of federal and state regulation in modern telecommunications law.  The Federal Communications Commission ("FCC") is vested with broad regulatory authority.[9]  And some regulatory authority has been reserved to the states; though the FCC's preemption authority prevails when a conflict between the two regulatory regimes arises.[10]

Invoked by Crown Castle here, Sections 253 and 332 of the FTA expressly limit the states' regulatory authority over a particular technology or service.[11] Section 253(a) preempts the enforcement of state or local government acts that "prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."[12]  States may "impose, on a competitively neutral basis[,] . . . requirements necessary to preserve and advance

---

[8]  *Cellular Tel. Co. v. Town of Oyster Bay,* 166 F.3d 490, 493 (2d Cir. 1999) (quoting H.R. REP. NO. 104-458, at 206 (1996)) (cleaned up).

[9]  47 U.S.C. § 151 *et seq.*; *see also* CHRIS LINEBAUGH & ERIC HOLMES, CONG. RSCH. SERV., R46736, STEPPING IN: THE FCC'S AUTHORITY TO PREEMPT STATE LAWS UNDER THE COMMUNICATIONS ACT 1 (2021).

[10]  *See, e.g.*, *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A] federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority."); *Mozilla Corp. v. FCC*, 940 F.3d 1, 75 (D.C. Cir. 2019) ("[I]n any area where the Commission lacks the authority to regulate, it equally lacks the power to preempt state law.").

[11]  *See* 47 U.S.C. § 253(a) (1996) (removal of barriers to entry); 47 U.S.C. § 332 (2018) (mobile services).

[12]  47 U.S.C. § 253(a).  Telecommunications service is the "offering of telecommunications for a fee directly to the public . . . regardless of the facilities used." *Id.* § 153(53) (2010).  And "telecommunications" is "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." *Id.* § 153(50).

universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers."[13] Violations thereof may be saved by Section 253(c)'s "safe harbor," that allows local governments "to require fair and reasonable compensation from telecommunications providers" for the use of public rights-of-way so long as the fees are "competitively neutral and nondiscriminatory."[14]

Similarly, Section 332 provides that state or local zoning regulations shall neither unreasonably discriminate among providers of functionally equivalent services, nor effectively prohibit the provision of personal wireless services.[15] Aside from these limitations, however, Section 332 leaves decisions concerning the "placement, construction, and modification of personal wireless service facilities" to state and local authorities.[16]

Both sections provide mechanisms through which a party subject to a state or local requirement might challenge the requirement: a party may (i) petition the FCC directly to preempt enforcement of a requirement that runs afoul of Sections 253(a)

---

[13]  47 U.S.C. § 253(b).

[14]  *Id*. § 253(c).

[15]  *Id*. § 332(c)(7)(B); *see also Kaspers v. Verizon Wireless Servs., LLC*, 2021 WL 2193584, at \*3 (N.D. Ga. May 11, 2021) (holding § 332 also applies to 5G infrastructure because the statute prohibits state and local regulation of "personal wireless service facilities;" so, the advancement of wireless technology since the Act's creation doesn't render the statutory language meaningless) (citation omitted).

[16]  47 U.S.C. § 332(c)(7)(A).

or (b);[17] or (ii) bring an action in federal court.[18]

### C. Fifth-Generation Networks and the Evolving Telecommunications Regulatory Landscape

Fifth-generation (5G) mobile technologies "represent the next iteration of mobile communications technologies that were designed to improve current (e.g., 3G, 4G) mobile networks. 5G networks are expected to provide faster speeds, greater capacity, and the potential to support new features and services."[19] Implementation of the 5G technology requires hundreds of small cells to be installed—in close proximity to each other—onto utility poles and similar infrastructure.[20]

Installation of small cells and supporting equipment requires approval from federal, state, or local governments, depending on the location.[21] "Local governments and residents have cited concerns about [the] management of rights-of-way, fees charged to providers for access, and the impact of small cells on

---

[17] *Id.* § 253(d).

[18] *See id.* § 332(c)(7)(B)(v).

[19] Jill Gallagher & Michael DeVine, Cong. Rsch. Serv., R45485, Fifth-Generation (5G) Telecommunications Technologies: Issues for Congress 1 (2019).

[20] Dean DeChiaro, *Fight over utility poles for 5G brewing in upstate New York*, CQ Roll Call Washington Energy Briefing, Sept. 24, 2019, 2019 WL 4621447.

[21] "Small cells are low-powered radio access nodes . . . installed on existing structures, such as buildings, poles, or streetlights. When attaching small cells to existing infrastructure, installation and operation requires connection to a power source, backhaul (*e.g.*, fiber optic cable connection or wireless connection to a core network), *and a permit for use of the space.*" *See* Gallagher & DeVine, *supra* note 19, at 23 (emphasis added).

property values and health and safety."[22]  Companies aiming to "win the so-called 'race to 5G' must navigate an uneven regulatory landscape in which municipalities have a range of requirements for use of utility poles and other types of public infrastructure."[23]

Responding to those concerns, the FCC issued its 2018 "Small Cell" and "Moratorium" Orders establishing regulatory parameters and standards, catering to a streamlined deployment of 5G network infrastructure.[24]  A large group of local governments, public and private utilities, and wireless service providers challenged the orders in federal court.[25]  The United States Court of Appeals for the Ninth Circuit largely upheld the challenged provisions other than some aesthetic requirements.[26]

The Small Cell Order requires any fees imposed to be "objectively reasonable" in relation to a local government's actual costs, and "no higher than the

---

[22]  Gallagher & DeVine, *supra* note 19, at 24.

[23]  DeChiaro, *supra* note 20.

[24]  *See Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, 33 FCC Rcd. 9088 (2018) ("Small Cell Order"), *vacated in part City of Portland v. United States*, 969 F.3d 1020 (9th Cir. 2020), *cert. denied sub nom. City of Portland, Or. v. FCC*, 141 S. Ct. 2855 (2021); *Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv.*, 33 FCC Rcd. 7705, 7789 (2018) ("Moratorium Order") ("[W]e are interpreting the scope of the substantive prohibition set forth in section 253(a).").

[25]  *See City of Portland*, 969 F.3d at 1028.

[26]  *Id.* at 1053.

fees charged to similarly-situated competitors."[27]  It also implemented a "shot clock" setting time limitations for reviewing and responding to permit applications.[28]  The timing requirements apply to *all* permitting decisions, with a sixty-day deadline for "applications for installation on existing infrastructure, and ninety days for all other applications."[29]

The Moratorium Order preempts any ordinance or other written requirement that "materially inhibit[s]" small cell deployment—whether express or *de facto*.[30] Express moratoria being defined as "statutes, regulations, or other written legal requirements in which state or local governments expressly prevent or suspend the acceptance, processing, or approval or applications or permits necessary for deploying telecommunications services[,]" even if limited in duration.[31]  And *de facto* moratoria are defined as "state or local actions that are not express moratoria, but that effectively halt or suspend the acceptance, processing, or approval of applications or permits for telecommunications services or facilities in a manner akin to an express moratorium. De facto moratoria violate Section 253 only when they unreasonably or indefinitely delay deployment."[32]

---

[27]  *Id.* at 1037 (quoting Small Cell Order ¶ 50).

[28]  *Id.* at 1043.

[29]  *Id.* (citations omitted).

[30]  *Id.* at 1047.

[31]  *Id.* (cleaned up).

[32]  *Id.* (cleaned up).

A number of states have since passed or proposed legislation to streamline the permitting process for small cell deployment—Delaware included.

## D. DELAWARE'S ADVANCED WIRELESS INFRASTRUCTURE INVESTMENT ACT

The Delaware Advanced Wireless Infrastructure Investment Act ("State Wireless Act" or "SWA") was enacted in August 2017 to foster statewide economic development in the wireless communications systems arena.[33] The SWA opened the market to non-public utility companies, *e.g.*, privately held wireless service and infrastructure providers, granting them "access to . . . and the ability to attach to poles and structures in the state rights-of-way . . . subject to the same policies and procedures as public utilities."[34]

Like its federal analog, the SWA requires "expeditious processes and reasonable and nondiscriminatory rates" concerning permit applications and licensing for the installation and maintenance of small wireless facilities.[35] DelDOT is tasked with processing permit applications for the construction, maintenance, and operation of utility poles or small wireless support structures within state rights-of-way.[36] It must implement nondiscriminatory permit approvals and processes, and "may not institute, either expressly or de facto, a moratorium on issuing permits or

---

[33] *See* DEL. CODE ANN. tit. 17, § 1601 *et seq.* (2019).

[34] *Id.* § 1602.

[35] *Id.*

[36] *Id.* § 1609.

other approvals for the collocation of small wireless facilities . . . in the [State] ROW."[37]

## E. THE CITY WIRELESS REGULATIONS

The City of Wilmington's home rule Charter grants the City complete legislative and administrative power over municipal functions.[38] That authority has been described as follows:

> The grant includes the power to enact ordinances necessary and proper for executing any of the City's express or implied powers. The purpose of the home rule provisions was to enable municipalities to exercise the powers of the sovereign except as limited by either the State Constitution or State statute. Accordingly, a limit to Wilmington's sovereignty is explicit in § 802:
>
> > Every municipal corporation in this State . . . may, subject to the conditions and limitations imposed by this chapter, amend its charter so as to have and assume all powers which, under the Constitution of this State, it would be competent for the General Assembly to grant by specific enumeration and which are not denied by statute.
>
> Thus, the City enjoys complete powers of legislation and administration relating to its municipal functions.[39]

Consistent with that authority, the City adopted and incorporated the Wilmington City Code, which "constitutes a complete recodification of the general

---

[37] *Id.* § 1609(b)(8). In many local, state, and federal statutes and regulations the term "right-of-way" is abbreviated to "ROW." *E.g. id.* § 1603(19). And so that same shorthand will be used hereinafter.

[38] *Schadt v. Latchford*, 843 A.2d 689, 691 (Del. 2004).

[39] *Id.* (cleaned up).

and permanent ordinances of the City of Wilmington, Delaware."[40]  In December 2018, the "Wireless Amendment" was adopted and incorporated into Chapter 42 of the City Code.[41]  The City soon thereafter adopted and incorporated the *Wireless Telecommunications Facilities Manual*.[42]  Together, these recent adoptions in the Code are what comprise the "City Wireless Regulations."

Those regulations prohibit any activity in City rights-of-way "without first obtaining any required authorization from the city which may include a franchise, license, lease or any other form of authorization required under federal, state or local law."[43]  Authorization and permit requirements related to wireless telecommunications facilities must "meet the minimum requirements set forth in . . . the Wireless Telecommunications Facilities Manual, *in addition to the requirements of any other applicable law*."[44]  In addition to use and occupancy permits, wireless services or infrastructure providers must also obtain a separate

---

[40]  WILMINGTON, DEL., CODE (PREFACE) (1993).

[41]  1 *Wilm. C.* § 42-701 *et seq.* (2018) (Right-of-Way Management for Utility Service).

[42]  Wilmington, Del., Ordinance 18-039 (Dec. 6, 2018) (hereinafter "Wireless Manual").  Though not included in or appended to the Code, the Wireless Manual is accessible on the City's website at: https://www.wilmingtonde.gov/home/showpublisheddocument/8207/636802151213300000. Among other matters, it details how the City receives and processes applications and clarifies the procedures "to install, maintain and operate wireless telecommunications facilities in the public rights of way." *See id.* § 1.2.

[43]  1 *Wilm. C.* § 42-706(a)(1).  "Franchise means the legal authorization granted by the city to a person to construct, maintain, or emplace facilities upon, across, beneath, or over any public right-of-way in this city." *Id.* § 42-704(o).

[44]  *Id.* § 42-706(e)(1) (emphasis added).

-10-

construction permit before commencing any construction within City-managed rights-of-way.[45]

All applicants are to be treated "in a neutral and nondiscriminatory manner" and the regulations shall not "be applied to create any conflict with applicable state law or applicable and enforceable agreements or easements."[46]

### F. CROWN CASTLE'S EFFORTS TO INSTALL 5G INFRASTRUCTURE IN THE CITY OF WILMINGTON

Since 2018, Crown Castle has been seeking the City's approval to install thirty-three (33) distributed antenna systems, *i.e.*, nodes, throughout the City of Wilmington.[47] It plans to install twenty-two (22) nodes in City-owned rights-of-way (hereinafter "City nodes") and eleven (11) nodes in purported DelDOT-owned rights-of-way (hereinafter "DelDOT nodes").[48]

Before granting any of Crown Castle's permit applications, the City is requiring Crown Castle, pursuant to the City Wireless Regulations, to execute a franchise agreement as a precondition to begin its node placement project.[49] Crown

---

[45] *Id.*; *see also id.* §§ 42-706(b)-(d) (construction permits required). This requirement is subject to certain exceptions specified in the Code. *Id.* § 42-706(b)(3).

[46] Wireless Manual §§ 1.3-1.4.

[47] Del. Ch. Arg. Tr. at 5; *see also* Second Am. Compl. ¶ 1.

[48] Del. Ch. Arg. Tr. at 5.

[49] *Id.* at 29-32.

Castle refuses to enter into any such agreement, contending its terms are objectionable and preempted by the SWA and FTA.[50]

Further complicating Crown Castle's quandary is the already-installed nine nodes in purported DelDOT-owned rights-of-way pursuant to a DelDOT-issued authorization permit.[51] Though installed, these nodes are inoperable until Crown Castle installs underground safety equipment, *i.e.*, grounding rings, required by Delmarva Power—a public utility company also regulated by the Public Service Commission.[52] But placement of a grounding ring requires displacing the sidewalk.[53] And that first requires a city construction permit.[54] Crown Castle has sought, and the City refuses to grant, the necessary construction permits.[55]

Because the City contends the sidewalk is within its jurisdiction, it is requiring Crown Castle to enter into a separate franchise agreement for the DelDOT nodes, claiming the grounding rings constitute a "wireless telecommunications facility"

---

[50] *See id.* at 7-8.

[51] *Id.*; *see also* DelDOT's Answer to Second Am. Compl. ¶ 104; DelDOT's Answering Br. in Opp'n to Mot. for Summ. J. at 5, Mar. 25, 2022 (D.I. 36).

[52] Del. Ch. Arg. Tr. at 21; *see Delmarva Power & Light Co. v. City of Seaford*, 575 A.2d 1089, 1096 (Del. 1990) ("Public utilities are defined in [26 *Del. C.* § 102(2)] to include electric and gas providers such as Delmarva."). "As a public utility, the statute authorizes it to use public roads as conduits for electrical service, subject to the consent of municipalities in which it operates." *Id.* at 1098 (citing 26 *Del. C.* §§ 906, 907).

[53] Del. Ch. Arg. Tr. at 7.

[54] *Id.*; *see* 1 *Wilm. C.* §§ 42-706(b)-(d).

[55] Del. Ch. Arg. Tr. at 7.

-12-

under the City Wireless Regulations.[56] Thus, the project has been and remains suspended because the City refuses to issue construction permits unless or until Crown Castle enters into a franchise agreement with the City.

The parties' dispute arises out of their differing interpretations of the laws purportedly authorizing their respective actions. They disagree whether or how the following statutory and regulatory authorities coexist, and which apply: (i) the FTA; (ii) the SWA; (iii) the City Wireless Regulations; and (iv) a longstanding contract between DelDOT and the City (the 1956 Agreement).

At present, nine nodes have been installed in disputed DelDOT-owned rights-of-way but are inoperable, and the remaining twenty-four nodes are still pending installation in City-owned rights-of-way (including two supposed DelDOT nodes). The completion of the DelDOT nodes aspect of the project remains at a standstill until either: (1) Crown Castle enters into a franchise agreement with the City; *or* (2) the Court, via summary judgment, estops the City from enforcing its requirements, thereby giving Crown Castle the green light to move forward with its project, including installation of the grounding rings.

---

[56] *Id.* at 20-21.

## G. THE ENSUING LITIGATION

This case originated in our Court of Chancery where Crown Castle sought declaratory and injunctive relief.[57] After oral argument on Crown Castle's summary judgment motion, the Vice Chancellor determined the requested relief sought—the issuance of a building permit—was a ministerial function, an action sounding in mandamus that was beyond the Court of Chancery's limited jurisdiction.[58] So the matter was then transferred to this Court under 10 *Del. C.* § 1902.[59]

Before addressing the merits of the parties' refiled submissions, it became clear to the Court that a threshold issue to be determined is who controls the sidewalks within purported DelDOT-owned rights-of-way, and whether DelDOT needed to be joined as a necessary party.[60] The Court requested supplemental submissions addressing those concerns. The parties were heard on the supplemented record, and the Court determined DelDOT indeed was a necessary party.[61] DelDOT has since been joined in this action and has docketed its required responsive pleadings.[62]

---

[57] Second Am. Compl. at 1 n.1.

[58] *Crown Castle Fiber LLC v. City of Wilm.*, 2021 WL 2838425, at *6 (Del. Ch. July 8, 2021).

[59] Order Granting Pl.'s Election to Transfer, *Crown Castle Fiber LLC v. City of Wilm.*, C.A. No. 2019-0656-MTZ, (Del. Ch. Aug. 16, 2021) (D.I. 35); *see also* Compl., Aug. 16, 2021 (D.I. 1).

[60] Court's Letter to Counsel at 5, Jan. 3, 2022 (D.I. 24).

[61] D.I. 29.

[62] *See* D.I.s 33, 36.

Now before the Court are the parties' fully briefed submissions related to Crown Castle's long-pending summary judgment prayer.

## II. PARTIES' CONTENTIONS

### A. PLAINTIFF CROWN CASTLE'S MOTION FOR SUMMARY JUDGMENT

To broadly summarize, Crown Castle seeks a declaratory ruling on: (i) whether the City has effectively prohibited it from providing wireless services in violation of the FTA; and (ii) whether the City or DelDOT has jurisdiction over the already-installed DelDOT nodes. It asserts that the Court's resolve of its posed questions of law will wholly settle the underlying dispute.

Crown Castle insists the FTA and SWA preempt the City Wireless Regulations, and DelDOT cannot now claim—*after* issuing the permits—that the SWA does not apply.[63] Relatedly, Crown Castle asserts that the Court's interpretation of the competing statutes will also provide the clarity needed to advance the City Nodes aspect of the project.[64] As such, Crown Castle asks the Court to enter judgments declaring:

1. That the City Wireless Regulations are preempted by the FTA;

2. That the City's draft License Agreement and its related refusal to undertake any other reviews or approvals related to the project prohibits Crown

---

[63] Pl.'s Reply Br. to DelDOT's Answering Br. at 18, Apr. 8, 2022 (D.I. 37).

[64] Pl.'s Am. Reply Br. in Supp. of Mot. for Summ. J. at 1, Dec. 15, 2021 (D.I. 22) (citing *Weiss v. Weiss*, 952 A.2d 149, 152 n.11 (Del. Ch. 2007)).

Castle from providing telecommunications services in violation of 47 U.S.C. § 253(a);

3. That the SWA gives DelDOT exclusive jurisdiction over small cell facilities;

4. That the DelDOT nodes are subject to the City Wireless Regulations; and

5. That Crown Castle has obtained all necessary and required permits and authorizations and may immediately proceed with completing the DelDOT nodes project—including grounding ring placement.[65]

## B. DELDOT'S OPPOSITION

DelDOT argues judgment in Crown Castle's favor is not proper.[66] According to DelDOT, it lacks authority under the SWA to issue the digging permit for the grounding rings because under the 1956 Agreement the City has express jurisdiction over its sidewalks.[67] Too, DelDOT seemingly concedes that it issued the nine permits under the SWA in error; pursuant to the 1956 Agreement—which it says governs here—DelDOT's involvement wasn't required at all.[68]

## C. THE CITY OF WILMINGTON'S OPPOSITION

The City contends there are genuine issues of fact precluding entry of summary judgment in Crown Castle's favor on any count. It first argues that the 1956 Agreement establishes that the thirty-three locations at issue are within the

---

[65] *See* Second Am. Compl. ¶¶ 122-28 (Count I).

[66] DelDOT's Answering Br. in Opp'n to Mot. for Summ J. at 3. DelDOT takes no position on Crown Castle's claims against the City. *Id.*

[67] *Id.* at 19.

[68] *Id.* at 18-20.

City's, rather than DelDOT's, rights-of-way.[69]  It also contends that the grounding rings are "wireless telecommunications facilities" as defined by the City Wireless Regulations and are therefore subject to a license requirement.[70]

Finally, the City argues that its recent proposed draft License Agreement with Crown Castle is not facially invalid or unconscionable.  Because it is substantially similar to an existing license agreement between the City and an AT&T subsidiary, the City says the proposed Agreement does not violate any FTA provisions.[71]

## III.  APPLICABLE LEGAL STANDARDS

Delaware Superior Court Civil Rule 56(c) provides that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[72]  The Court's principal function in this context is to examine the record to determine whether genuine issues of material fact exist, but not to decide such issues.[73]  Where it appears there is a material fact in dispute or that further

---

[69]  City's Am. Answering Br. in Opp'n to Pl.'s Mot. for Summ. J. at 2, Nov. 30, 2021 (D.I. 20).

[70]  *Id.*

[71]  *Id.*

[72]  *Bobcat N. Am., LLC v. Inland Waste Hldgs., LLC*, 2019 WL 1877400, at *3 (Del. Super. Ct. Apr. 26, 2019) (quoting Del. Super. Ct. Civ. R. 56(c) (2022)); *see also Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995) ("If the facts permit reasonable persons to draw from them but one inference, the question is ripe for summary judgment." (citation omitted)).

[73]  *Merrill v. Crothall-Am. Inc.*, 606 A.2d 96, 99-100 (Del. 1992) (citations omitted).

-17-

inquiry into the facts would be appropriate, summary judgment will not be granted.[74]

A review of the record here evidences a contest on statutory (and some contract) interpretation—a question of law to be decided by the Court.[75] As summary judgment is indeed the proper vehicle when questions of law remain on a given issue, and trial unnecessary thereon, the Court is satisfied this matter is ripe for certain summary judgment.[76]

Delaware courts approach statutory interpretation by first determining whether ambiguity exists in the statute.[77] Like contract interpretation, clear and unambiguous language in a statute should be given its usual and ordinary meaning.[78] It is well-settled that "conclusive evidence of legislative intent" is a plain reading of the statute's clear and unambiguous language.[79] "Delaware applies equivalent interpretive rules in the statutory and contractual contexts, refusing to enforce highly literal readings that lead to absurd results and ending their inquiry to the exclusion

---

[74] *Ebersole v. Lowengrub*, 180 A.2d 467, 468-69 (Del. 1962).

[75] *See Dambro v. Meyer*, 974 A.2d 121, 129 (Del. 2009) ("Questions of statutory interpretation are questions of law . . . ." (citation omitted)); *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009) ("Questions concerning the interpretation of contracts are questions of law . . ." (citation omitted)).

[76] *Pike Creek Recreational Servs., LLC v. New Castle Cnty.*, 238 A.3d 208, 213 (Del. Super. Ct. 2020), *aff'd* 2021 WL 3437984 (Del. Aug. 5, 2021).

[77] *Doroshow, Pasquale, Krawitz & Bhaya v. Nanticoke Mem'l Hosp., Inc.*, 36 A.3d 336, 342 (Del. 2012).

[78] *Pike Creek Recreational Servs., LLC*, 238 A.3d at 213 (citations omitted).

[79] *Id.* (quoting *Magill v. N. Am. Refractories Co.*, 128 A.2d 233, 236 (Del. 1956)).

-18-

of extrinsic evidence when unambiguous language makes the meaning of the contract or statute plain."[80]

## IV.  DISCUSSION

### A.  PREEMPTION BY FEDERAL LAW

Crown Castle asks the Court to declare that the SWA and City Wireless Regulations are preempted by Section 253(a) of the FTA.[81]  Before addressing the merits, however, the Court must first be assured it has subject-matter jurisdiction.

Crown Castle is correct that state courts enjoy a presumption of concurrent jurisdiction over federal claims absent "an explicit statutory directive" to the contrary.[82]  But here, a plain reading of Section 253 indeed reveals an explicit directive to the contrary.  Under Section 253(d), Congress expressly reserved preemption authority to the FCC for alleged violations of subsections (a) or (b):

> If, after notice and an opportunity for public comment, *the Commission determines* that a State or local government has permitted or imposed any statute, regulation, or legal requirement *that violates subsection (a) or (b)*, *the Commission shall preempt the enforcement of such statute,*

---

[80]  *Id.* at 213-14 (citations omitted).

[81]  The Court is satisfied that Crown Castle is a telecommunications services provider under § 253.  *See* 33 FCC Rcd. 9088, 9103, n. 84 ("The fact that facilities are sometimes deployed by third parties not themselves providing covered services also does not place such deployment beyond the purview of Section 253(a)."); *see also id.* at 9105, n.87 (agreeing with courts' interpretations that the scope of "telecommunications services" under § 253 includes "any covered service a provider wishes to provide, incorporating the abilities and performance characteristics it wishes to employ"); *see also ExteNet Systems, Inc. v. City of Cambridge, Mass.*, 481 F. Supp. 3d 41, 52 (D. Mass. 2020) (finding wireless infrastructure provider could bring effective prohibition claim under § 253).

[82]  Pl.'s Suppl. Mem. at 4-8, June 30, 2022 (D.I. 42).

regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.[83]

Given the statute's unambiguous language, the Court agrees with those authorities that have determined no private right of action exists for claims brought under Sections 253(a) or (b).[84] The specific reference to subsections (a) and (b) coupled with the clear "omission of reference to § 253(c), compels the conclusion that Congress did not intend to create an implied private right of action for § 253(a); instead Congress intended for the FCC to enforce § 253(a), while telecommunications providers may enforce § 253(c)."[85] The FCC's 2018 Small Cell and Moratorium Orders also support this conclusion.[86]

Accordingly, Crown Castle's request for a declaration from this Court addressing its preemption challenges under Section 253(a) must be **DENIED** for lack of jurisdiction.

---

[83]   47 U.S.C. § 253(d) (emphasis added).

[84]   *See Qwest Corp. v. City of Santa Fe, N.M.*, 380 F.3d 1258, 1266 (10th Cir. 2004) (concluding the legislative history of § 253 is devoid of congressional intent supporting a private right of action); *NextG Networks of NY, Inc. v. City of New York*, 513 F.3d 49, 53 (2d Cir. 2008) (holding no private right of action for damages exists under § 253); *Superior Commc'ns v. City of Riverview, Mich.*, 881 F.3d 432, 443-44 (6th Cir. 2018) (collecting cases) (concluding no private right of action exists under § 253(a)).

[85]   *Bristol Tenn. Essential Servs. v. United Tel. Se., LLC*, 2015 WL 10096190, at *6 (E.D. Tenn. Sept. 30, 2015).

[86]   33 FCC Rcd. 9088, 9138 ("Should factual questions arise about whether a state or locality is engaged in such [prohibited] behavior, Section 253(d) affords state and local governments and private parties an avenue for specific preemption challenges."); *see also* 33 FCC Rcd. 7705, 7789 ("[C]ourts have concluded that parties may bring section 253(a) preemption challenges directly in federal court, regardless of the availability of the Commission as a forum to resolve preemption disputes pursuant to section 253(d).").

## B. THE CITY'S LICENSE AGREEMENT

To date, a License Agreement has not been executed by the parties. Yet, Crown Castle seeks a declaratory ruling addressing whether its terms are unfair or unconscionable. Among other objections, Crown Castle says the terms of the agreement contain impermissible fees, *e.g.*, annual license fees, increased fees for "every increase in six (6) cubic feet in volume and each additional wireless provider that is collocated on the Node," and the City's option to increase any of the fees charged by 2.5 times if there is a unilateral termination.[87]

Jurisdictional issues aside, the FCC's Small Cell Order broadly clarified when fees imposed by a local government fall under Section 253(a)'s prohibition. A given fee structure may be safe under Section 253(c) if the fees imposed are "reasonable" and representative of the government's actual costs.[88] The FCC clarified thusly:

> ROW access fees, and fees for the use of government property in the ROW, such as light poles, traffic lights, utility poles, and other similar property suitable for hosting Small Wireless Facilities, *as well as application or review fees and similar fees imposed by a state or local government as part of their regulation* of the deployment of Small Wireless Facilities inside and outside the ROW, violate Sections 253 or 332(c)(7) *unless* these conditions are met: (1) the fees are a reasonable approximation of the state or local government's costs, (2) only objectively reasonable costs are factored into those fees, and (3) the fees are no higher than the fees charged to similarly-situated competitors in similar situations . . . .

---

[87]  Second Am. Compl. ¶¶ 89-92.

[88]  33 FCC Rcd. 9088, 9115.

By contrast, fees that recover more than the state or local costs associated with facilities deployment—or that are based on unreasonable costs, such as exorbitant consultant fees or the like—go beyond such governmental recovery of fundamental costs of entry.[89]

As Crown Castle has yet to enter into the agreement, further factual development is necessary to determine whether the fees to be imposed by the City meet the exempted conditions. Where it appears a material fact is in dispute or further inquiry into the facts would be appropriate, summary judgment will not be granted.[90] Just so here.

The City argues that its recent proposed draft License Agreement with Crown Castle is substantially similar to an existing agreement between the City and an AT&T subsidiary.[91] Thus, to ensure the fees to be borne by Crown Castle are no higher than those charged to a similarly-situated competitor, further inquiry is necessary. And to the extent the parties dispute whether the AT&T subsidiary is a similarly-situated competitor, this disputed fact further militates denial of summary judgment here. Lastly, because local governments may collect fees that are a reasonable approximation of actual costs incurred, further record development is required to determine whether the City's fees represent a reasonable approximation of its *actual* costs related to Crown Castle's use of its rights-of-way.

---

[89]   *Id.* at 9112-13, 9117 (emphasis added).

[90]   *Ebersole*, 180 A.2d at 470.

[91]   City's Am. Answering Br. in Opp'n to Pl.'s Mot. for Summ. J. at 6.

In addition to the undeveloped facts, the Court is not assured subject matter jurisdiction is proper. Crown Castle's motion must therefore be **DENIED**.

## C. THE SWA DOES NOT GIVE DELDOT EXCLUSIVE JURISDICTION OVER "SMALL CELL FACILITIES."

Under Delaware law, state statutes and municipal ordinances and regulations may coexist, so long as they don't conflict.[92] Where they do, the statute prevails.[93] "The predominant test for conflict in a preemption analysis is whether the state statute was intended to be exclusive. Legislative intent to make a state statute exclusive of any regulation of the same subject matter by a political subdivision may be express or implied."[94]

### 1. *The plain language of the State Wireless Act bears no indicia of legislative intent to make it exclusive of any regulation of the same subject matter by a political subdivision.*

To determine express-exclusivity intent, courts first look to the plain language of the statute or legislative history for an explicit provision declaring "that the state statute is intended to replace or prevail over any pre-existing laws or ordinances that govern the same subject matter."[95] The SWA has no such provision.[96] The plain

---

[92] *Cantinca v. Fontana*, 884 A.2d 468, 473 (Del. 2005).

[93] *Id.* (citation omitted).

[94] *Id.* (citations omitted).

[95] *Id.* (citation omitted).

[96] *See* DEL. CODE ANN. tit. 17, § 1601 *et seq.* (2019).

language instead evinces legislative recognition and incorporation of DelDOT's preexisting, delegated, and/or shared responsibilities with political subdivisions.

The General Assembly conditioned DelDOT's rights-of-way responsibilities under the SWA "in accordance with § 131(a) of this title."[97]  If DelDOT was meant to have exclusive responsibility of state rights-of-way under the Act, the General Assembly wouldn't have referenced a standard of conduct articulated elsewhere in the statute.[98]  No doubt, "in accordance with" is significant of some other criteria to which DelDOT is already bound.

To be sure, Section 131(a) defines DelDOT's general jurisdiction, powers, and duties.  "All the public roads, causeways, highways and bridges in this State which have been or may hereafter be constructed, acquired *or accepted* by the Department of Transportation shall be under the absolute care, management and control of the Department."[99]  Moreover, 17 *Del. C.* § 134(a) constrains some of those broad jurisdictional powers vis-à-vis political subdivisions:

> [DelDOT] shall have no power, authority or jurisdiction of the streets of any incorporated city or town, except as otherwise provided in this section, unless such power, authority and jurisdiction shall be voluntarily given and surrendered by such city or town to the

---

[97]  DEL. CODE ANN. tit. 17, § 1602(3) (2019).

[98]  *See Green v. Cnty. Council of Sussex Cnty.*, 415 A.2d 481, 484 (Del. Ch. 1980), *aff'd* 447 A.2d 1179 (Del. 1982) ("It is assumed that when the General Assembly enacts a later statute in an area covered by a prior statute, it has in mind the prior statute and therefore statutes on the same subject must be construed together so that effect is given to every provision unless there is an irreconcilable conflict . . . .").

[99]  DEL. CODE ANN. tit. 17, § 131(a) (2019) (general jurisdiction) (emphasis added).

Department and then only upon such terms as the Department shall prescribe.[100]

Thus, consistent with Sections 131(a) and 134(a)'s boundaries, the legislature was careful to limit DelDOT's obligations under the SWA to "*only* apply to activities of a wireless provider within the ROW, *over which the Department has absolute control*."[101]  The conditional language "over which the Department has absolute control" further demonstrates the General Assembly's intent to avoid replacing or preempting any pre-existing laws or ordinances governing the same subject matter. As such, no express-exclusivity intent is manifest.

### 2. *The SWA and City Wireless Regulations are not implicitly inconsistent.*

Having determined the SWA was not intended to be exclusive, the Court still must address whether implied-exclusivity intent exists.  "Implied exclusivity intent may be found where the two regulations are inconsistent; for example, . . . the local ordinance must hinder the objectives of the state statute."[102]

The City Wireless Regulations expressly provide that any application of its provisions shall not "create any conflict with applicable state law or applicable and enforceable agreements or easements."[103]  So, the express deference to state statutory

---

[100] *Id.* § 134(a) (authority in incorporated towns and cities; construction and maintenance of highways; local authority).

[101] *Id.* § 1604 (emphasis added).

[102] *Cantinca*, 884 A.2d at 473-74 (citations omitted).

[103] Wireless Manual § 1.3.

-25-

law in the event of a conflict is persuasive that they are not inconsistent with or a hinderance of the SWA's objectives.[104]

And like both the FTA and SWA, the City Wireless Regulations are intended to "permit rapid deployment of . . . [and] clarify the process for applying and obtaining approval to install, maintain and operate wireless telecommunications facilities in the public rights of way."[105] All applicants are to be treated "in a neutral and nondiscriminatory manner with considerations that may be unique to the technologies, situation and legal status of each particular applicant or request for right-of-way use."[106]

The SWA and corresponding provisions of the City Wireless Regulations are consistent: "there remains no express or implied preemption-justifying conflict as between these two regulatory provisions."[107] Accordingly, the SWA and City Wireless Regulations harmoniously coexist, and wireless services and infrastructure providers conducting activity in City rights-of-way are subject to the City Wireless Regulations—Crown Castle included.

---

[104] *Cantinca*, 884 A.2d at 474 (finding the county ordinance and state statute were not impliedly inconsistent because both "explicitly defer[] to the stricter regulation in the event of a conflict").

[105] Wireless Manual § 1.2.

[106] *Id.* § 1.4 (Eligibility and Exemptions).

[107] *Cantinca*, 884 A.2d at 474.

## D. THE 1956 AGREEMENT CONTROLS.

DelDOT has statutory authorization to "make and enter into any and all contracts, agreements or stipulations for the execution of the purposes of [Title 17]."[108] And while the SWA gives DelDOT broad control over *statewide* rights-of-way, DelDOT has "no power, authority or jurisdiction of the streets *of any incorporated city or town . . . unless . . .* voluntarily given and surrendered by such city or town."[109] As such, DelDOT's statutory duties are purposefully limited to preserve the legislative and administrative rights of political subdivisions.

Consistent with the foregoing, the City surrendered some of its municipal powers to DelDOT—the terms of which are fully articulated in the parties' 1956 Agreement.[110] To date, the Agreement remains in full force and effect and both the City and DelDOT acknowledge its binding authority.[111]

The 1956 Agreement allocates responsibility for the repair, maintenance, and control of certain streets and rights-of-way within the City of Wilmington.[112] It enumerates a litany of streets whose construction and maintenance are DelDOT's responsibility.[113] Those responsibilities are limited, however, "to face to face of

---

[108] DEL. CODE ANN. tit.17, § 132(c)(9) (2019).

[109] *Id.* § 134(a) (emphasis added).

[110] DelDOT's Answering Br. in Opp'n to Mot. for Summ. J. at 18.

[111] City's Am. Answering Br., Ex. A, Decl. of Kelly A. Williams ("Williams Decl.") ¶ 4.

[112] Williams Decl. ¶ 3.

[113] *Id.* at Ex. A (1956 Agreement).

curbs and *will not include curbs, sidewalk maintenance,* street cleaning, drainage facility cleaning, street lighting, snow or ice removal or control, policing, or any responsibility whatsoever with respect to traffic . . . ."[114]

So DelDOT doesn't have any jurisdiction over City sidewalks. Indeed, without a specific grant like the 1956 Agreement, DelDOT has no statutory authority within any political subdivision *unless* surrendered by that municipality. The 1956 Agreement expressly sets forth the limited responsibilities the City surrendered to DelDOT, and those responsibilities are narrowly tailored to the explicit exclusion of the sidewalks.

Nonetheless, DelDOT approved, and Crown Castle installed, nine nodes onto utility poles housed on sidewalks that are specifically enumerated in and subject to the terms of the 1956 Agreement.[115] It appears this permit approval was in error as DelDOT neither has jurisdiction over City sidewalks nor does it have "absolute control" of the subject rights-of-way as required by the SWA. Thus, the City—*not* DelDOT—has exclusive jurisdiction over City sidewalks, and incidentally what have been misnomed till now "the DelDOT nodes."

---

[114] *Id.* at Ex. A ¶ 4 (emphasis added).

[115] DelDOT's Answering Br. in Opp'n to Mot. for Summ. J. at 5. The nodes "are installed on poles outside of the curb face . . . in the City sidewalks that abut the paved road surface," and are located as follows: one (1) node is on 2nd Street; three (3) nodes are 4th Street; one (1) node is on 5th Street; one (1) node is on Lancaster Avenue; one (1) node is on Maryland Avenue; one (1) node is on South Union Street; and one (1) node is on North Washington Street. *Id.* at 5-6.

**E. THE DELDOT NODES ARE SUBJECT TO CITY WIRELESS REGULATIONS.**

The DelDOT nodes have been installed in City-managed rights-of-way and thus subject to City ordinances. Recall that non-conflicting municipal regulations and state statutes governing the same subject matter may coexist, but the statute prevails when a conflict arises.[116]

**1.** *City Wireless Regulations: Authorization to Occupy the Rights-of-Way*

The City Wireless Regulations prohibit the occupancy of wireless services or infrastructure providers in the rights-of-way without written authorization "issued by the city, *or* an authorization of occupancy of the rights-of-way lawfully issued by the State of Delaware that permits occupancy of the portion of the public rights-of-way where a facility will be placed without further authorization from the city."[117] Authorizations may take the form of a "franchise, license, or other written consent issued by the city."[118]

"Statutes are passed by the [legislative body] as a whole and not in parts. Consequently, each part of the statute must be read in context to produce a harmonious whole."[119] Here, the repeated use of the disjunctive throughout the subsections of Section 47-706 makes it clear that prior authorization to occupy the

---

[116] *Cantinca*, 884 A.2d at 473.

[117] 1 *Wilm. C.* § 47-706(a)(2) (emphasis added).

[118] *Id.* § 42-706(a)(3).

[119] *Daniels v. State*, 538 A.2d 1104, 1110 (Del. 1988) (citation omitted).

-29-

rights-of-way favors substance over form. A plain reading demonstrates that the paramount concern is the prior authorization itself, *i.e.*, permission and notice to occupy the rights-of-way, rather than the issuing authority.

Though mistaken, it is undisputed that DelDOT issued a public rights-of-way occupancy agreement for the installation of the DelDOT nodes. So, to the extent the City is requiring Crown Castle to enter a use and occupancy agreement *in addition to* the DelDOT-issued use and occupancy permit, this may be unnecessary and inconsistent with the manifest intent of the SWA.

### 2. *City Wireless Regulations: Construction Permit & Grounding Rings*

As a general matter, Section 42-39 of the City Code requires a construction permit "prior to the opening of any sidewalk by any licensed contractor for the purpose of installing water service, gas or other utilities or for any other purpose."[120] The permit appears to be a generally applicable permit, issued readily for a wide range of installation purposes.

Incidentally, wireless services or infrastructure providers must obtain a separate construction permit before commencing any construction-related activity within City rights-of-way.[121] Authorization and permit requirements related to wireless telecommunications facilities must "meet the minimum requirements set

---

[120] 1 *Wilm. C.* § 42-39(a).

[121] *Id.* § 42-706(b).

forth in . . . the Wireless Telecommunications Facilities Manual . . . ."[122] Permits

"for construction of a wireless telecommunications facility . . . are not

authorizations to occupy the public rights-of-way."[123] And any "excavation on

DelDOT maintained roads in the city limits" is subject to state permit requirements

*in addition to* City construction permit requirements.[124]

So, the City's usually effortless issuance of a construction permit for utility

services imposes separate and more onerous requirements on wireless services or

infrastructure providers requesting the same permit. Here the construction permit

is required to install grounding rings to satisfy a Delmarva Power, rather than a City,

standard. Crown Castle says the DelDOT nodes would have been long-ago

operable if not for the grounding ring requirement. But because the City considers

grounding rings "small cell facilities" under the City Wireless Regulations, it

refuses to issue the permit unless or until a franchise agreement is executed. This

duplicative process seemingly conflicts with the SWA, and where a state statute

and municipal ordinance conflict, the statute prevails.[125]

Thus, the proper resolution of this conflict—where a provider installed

---

[122] *Id.* § 42-706(e).

[123] *Id.* § 42-706(a)(3).

[124] *Id.* § 42-706(d) ("City of Wilmington construction permits are also required in these circumstances, however, fees for city permits issued solely for excavation in the public rights-of-way are waived.").

[125] *Cantinca*, 884 A.2d at 473.

infrastructure pursuant to a permit sought and issued in good faith, but the issuing authority lacked jurisdiction over the territory—would be to implement the procedures and processes required under the SWA for projects occurring in DelDOT's jurisdiction. In other words, what would the DelDOT nodes project look like—in terms of applications, installation processes, and grounding ring requirements—if commenced in DelDOT's exclusive territory?

Given the current record, too many unresolved and underdeveloped facts remain to competently resolve this issue. And for the same reasons, the Court cannot determine whether the grounding rings are small wireless facilities under the City Wireless Regulations.[126] Indeed, further record development may reveal that the City's refusal to issue a permit for the grounding rings until some other, conditional criteria is met constitutes FCC-prohibited moratoria.[127] In which case, subject matter jurisdiction would again have to be addressed.

Accordingly, summary judgment on this limited record is improper and Crown Castle's motion, to the extent it seeks to force issuance of certain City

---

[126] Recall, in considering this motion for summary judgment, the Court construes the record in the light most favorable to the City. *Merrill*, 606 A.2d at 99. And on summary judgment, the Court "cannot try issues of fact . . . but only is empowered to determine whether there are issues to be tried." *GMG Cap. Invs., LLC*, 36 A.3d at 783 (internal quotation marks and citation omitted).

[127] 33 FCC Rcd. 7705, 7779-81 (describing *de facto* moratoria as "blanket refusals to process applications, refusals to issue permits for a category of structures, [and] frequent and lengthy delays of months or even years in issuing permits and processing applications").

permits and allowance of the nine DelDOT nodes to go live, must be **DENIED**.[128]

## V. CONCLUSION

For the reasons set forth herein, Crown Castle's Motion for Summary Judgment is **DENIED**. Pursuant to 47 U.S.C. § 253(d), the Court lacks jurisdiction to determine whether the SWA and City Wireless Regulations are preempted by Section 253(a). And for the same reasons—notwithstanding the disputed facts related to the terms and nature of the draft License Agreement, or how the DelDOT nodes project would fare under the SWA in exclusive DelDOT jurisdiction—summary judgment is improper and Crown Castle's motion is **DENIED** on all counts.

**IT IS SO ORDERED**.

_____
Paul R. Wallace, Judge

Original to Prothonotary
cc: All Counsel via File & Serve

---

[128] Even if Crown Castle's were to be considered an application for a writ of mandamus—as the Court of Chancery intimated it might—Crown Castle would not be due the relief sought. "[T]he basis for issuance and the scope of relief available through a writ of mandamus under Delaware law are both quite limited." *Guy v. Greenhouse,* 1993 WL 557938, at *1 (Del. Dec. 30, 1993). Mandamus is an exceptional remedy not available as a matter of right, but only in the exercise of sound judicial discretion. *Ingersoll v. Rollins Broadcasting of Del.,* 272 A.2d 336, 338 (Del. 1970). And when issued by this Court to command an administrative agency or public official to perform a duty, that duty must be one "to which the petitioner has established a clear legal right." *Clough v. State*, 686 A.2d 158, 159 (Del. 1996). "For the performance of a duty to be clearly owed to a petitioner, it must be nondiscretionary or ministerial, meaning that it is 'prescribed with such precision and certainty that nothing is left to discretion or judgment.'" *Brittingham v. Town of Georgetown,* 113 A.3d 519, 524-25 (Del. 2015) (quoting *Guy,* 1993 WL 557938, at *1). For the reasons mentioned, there is no such clearly owed duty of performance here.